PAUL THOMAS KENNEDY *v.* STATE OF INDIANA.

[No. 1069S237. Filed March 24, 1972.]

*Ronald V. Aungst, Lyons, Aungst, Guastella & Allen,* of Valparaiso, for appellant.

*Theodore L. Sendak,* Attorney General, *William F. Thompson,* Assistant Attorney General, for appellee.

HUNTER, J.—This is an appeal by Paul Thomas Kennedy, appellant (defendant below), from a conviction for first degree murder. Appellant was indicted by the Porter County, Indiana, Grand Jury on November 30, 1961. Appellant sought a change of venue which was granted and venue was changed to LaPorte County. December 19, 1961, appellant appeared in court with counsel and pleaded not guilty and not guilty by reason of insanity. Two days later the trial court appointed three psychiatrists to examine the appellant. On March 12, 1962, a hearing was held to determine if the appellant had sufficient mental competency to assist in his own defense and thus to stand trial. The court found that appellant did not

have sufficient comprehension to understand the nature of the criminal charges against him, and ordered appellant committed to the Norman M. Beatty Memorial Hospital on March 14, 1962.

Approximately six and a half years later on September 11, 1968, the superintendent of the Norman M. Beatty Memorial Hospital certified to the LaPorte Superior Court at Michigan City that appellant was competent to stand trial. Appellant was transferred to the LaPorte County jail for the purpose of standing trial. October 25, 1968, appellant appeared in court and again entered a plea of not guilty along with his special plea of insanity. Once again appellant was examined by three psychiatrists concerning his sanity. Trial by jury commenced on April 8, 1969, and on April 23, 1969 the jury returned a verdict of murder in the first degree finding the appellant should suffer death. On May 21, 1969, the trial court pronounced judgment and sentenced appellant to death by electrocution. Appellant filed a motion for a new trial which was denied and this appeal followed.

Appellant contends that the method by which the trial judge examined some of the expert psychiatric witnesses whose testimony was favorable to the appellant was prejudicial; that the judge did not examine these witnesses in an impartial manner but actually cross-examined these witnesses in a highly argumentative tenor. It is contended that the judge thereby abandoned his role as the impartial arbiter of the trial and assumed the role of prosecutor; that due to the closeness of the issue of insanity such conduct was highly prejudicial to the appellant.

The issue of insanity was indeed close. The crime took place in 1961 but appellant was not considered sufficiently competent to stand trial until 1968. The interim was spent in the maximum security section of Norman M. Beatty Memorial Hospital during which time the appellant received over sixty electro-shock treatments. Although the evidence as to sanity

was conflicting it was the opinion of four of the five psychiatrists who examined appellant that he was insane at the time the crime was committed. It was also shown that a short time before the crime occurred appellant's family had sought the advice of a Catholic priest who worked at Beatty Hospital concerning their difficulties with appellant and the priest advised them that the appellant needed psychiatric help before he killed himself or someone else. There was lay testimony going both ways concerning the apparent state of mind of appellant in and around the time when the crime was committed.

It is apparent from a review of the evidence on the issue of insanity that the testimony of the expert witnesses was extremely important to the adjudication of this cause. The impression these witnesses made on the jury could very well be the difference between the jury's finding the appellant sane and finding him insane.

It was during the trial judge's examination of Doctor Hill, one of the court appointed psychiatrists, that the exchange took place which is the basis for the contention of prejudicial conduct. The following is the judge's examination and defense counsel's objection thereto.

"Q    All right. Now, Doctor, I will ask you, based on your examination, what you read of these reports and so on, do you have an opinion as to whether the defendant, Paul Thomas Kennedy, was legally sane or insane?

A    At the time he committed the act?

Q    Yes?

A    With a qualifications (sic) that I've already made I feel reasonably sure that he did not comprehend what he was doing.

Q    Then would you say that he didn't know the difference between right and wrong at that time?

A    I would think he probably did not.

Q    Did not.

A    Did not know the difference, that's right.

Q    Nowhere in your report did you report this to me?

A  What I told you in the report was somewhat more circumscribed than that, that's quite true.

Q  What?

A  Was somewhat more circumscribed.

Q  What do you mean by that?

A  Well, that is I did not try to make a complete commitment until we came here to so I could present the whole thing in the testimony.

Q  But that isn't what I asked you in the letter, is it? Didn't I ask you to give me an opinion whether he was legally insane or not?

A  I gave you the best opinion I could in the letter I thought.

Q  Well, is that the best opinion you can give now?

MR. AUNGST:  Your Honor, I think I will want to interpose at this point. I think the doctor is indicating to the court that as a result of the request by the court he gave the best answer he could. He is now indicating some further factors upon which he would qualify the request that was made by the court. I think he has indicated that to the court and to the jury. With those added qualifications he has indicated that he could not comprehend the consequences of his act. Is that correct, Doctor? Is that how I understand it?

A  Yes. I've given all the facts that surrounded the situation, yes.

Q  Well, you had all those facts, didn't you, on December the 12th, 1968, when you examined him and read all the reports and everything else on December 12, 1968, didn't you?

A  I read them all, that's right.

Q  When did you make the report to me?

A  I made it in March. I wrote the report, yes.

Q  March 20, 1968, didn't you?

A  1969.

Q  1969. That's three months later. Isn't that right?

A  That's right.

Q  But you didn't say anything in there about that he didn't know the difference between right and wrong, did you?

A  No.

MR. AUNGST: Your Honor, I think at this point recognizing the fact that Doctor Hill is the court's witness. I nevertheless feel that this point is—best I possibly can—I think I will object to the court's line of questioning at this stage of the game. I feel that the answer has been stated by the doctor, that it is a favorable answer to the defendant and consequently the court is now in a position of taking so more or less the robe off and becoming an advocate in this lawsuit rather than a neutral party.

THE COURT: No, I just want to—

MR. AUNGST: I think the doctor has answered your question, Your Honor.

THE COURT: I asked this doctor to define legal insanity and I asked him to make an examination and determine whether he was legally sane or not. And no place in the report and his acknowledges, is the word insane used.

MR. AUNGST: I find myself in a strange position. Doctor Hill is not my witness.

THE COURT: I know.

MR. AUNGST: By the same token, I think the doctor is attempting to indicate to the court with the other qualifications that he has indicated here to the court, that this is the best opinion he can give, with those added qualifications.

THE COURT: What added qualifications?

MR. AUNGST: Qualifications regarding based on other reports and the other indications by the other doctors who made the examination. I don't believe Doctor Hill understood that was the basis upon which he was to give the court opinion before. Recognizing the fact, he now handles that qualifications, (sic) he's given opinions on those—

THE COURT: He bases his opinion on those. In his report he says, "our psychological studies indicate a substrate possible psychotic thinking, which may well have developed before or during the period in which acts were committed. And the record shows clearly that he was psychotic for a considerable period while in the hospital. As I have said above, I do not regard him as psychotic now and I cannot say with absolute surety of my own knowledge, he was psychotic at the time of the alleged offense. But he may well have been."

MR. AUNGST: Your Honor, I suggest to the court this is exactly the testimony that Doctor Hill has given us here this afternoon.

THE COURT: No it isn't.

MR. AUNGST: Well, as I say I'm in a strange position arguing with the court on its own witness.

THE COURT: The court's in a strange position, too.

MR. AUNGST: Yes, I recognize that, Your Honor.

Q On November 14th, 1968, I contacted you, didn't I, to examine—

A That's right.

Q December the 12th, you made the examination. Is that true?

A That's true.

Q On several occasions I wrote you a letter and asked you over the telephone to send the report, did I not?

A You did.

Q And you stated that you would have it in a short time, is that right?

A That's right.

Q But you didn't send it in until March the 20th, 1969, is that right?

A Yes, you're quite right. That's when you got it.

THE COURT: All right, take the witness."

It is clear from the *method* in which the trial judge examined this witness that he had serious doubts as to the witness' credibility. The examination is done in a highly argumentative fashion approximating the typical attempt at cross-examination and impeachment. The judge indicates by his conduct an attempt to show that the witness has changed his mind between the time of his initial report and his testimony at trial. As the twenty-four eyes and the twenty-four ears of the ever watchful jury follows this dialogue, how can they help but form the impression that the judge accepts this evidence with a great deal of disbelief?

There were several other incidents of improper judicial intervention in the trial. None of the remaining occurrences were objected to and it is the State's contention they are therefore waived. However, the task of this Court must be

to insure justice and due process. *Wilson* v. *State* (1943), 222 Ind. 63, 51 N. E. 2d 848, involved a situation where the alleged error was not contained in the motion for new trial. This Court there stated:

> "The easy course would have been to examine the motion for new trial and, having found that the errors relied upon are not mentioned therein, to have affirmed the judgment. . . . But in a case involving an appellant's life or liberty we may not ignore prejudicial errors affecting his constitutional rights. . . . The procedural rules that would prevent their consideration must give way to the fundamental principles of due process." 222 Ind. at 78, 51 N. E. 2d at 854.

A fair trial by an impartial judge and jury is an essential element in due process. See Art. 1, §§ 12 and 13 of the Constitution of Indiana. Also, an attorney would be reluctant to object to the judge's questioning as it then would appear to the jury that the defense and the court were in direct conflict thus doing further damage to defendant's cause.

> "A cross-examination that would be unobjectionable when conducted by the prosecuting attorney might unduly prejudice the defendant when it is conducted by the trial judge. Besides, the defendant's counsel is placed at a disadvantage, as they might hesitate to make objections and reserve exceptions to the judge's examination, because, if they make objections, unlike the effect of their objections to questions by opposing counsel, it will appear to the jury that there is direct conflict between them and the court. If it were the function of the judge in this country as it is in some foreign tribunals, to perform the duties incumbent here on the district attorney, the impression produced on the minds of the jury against the defendant would not be so inevitable. Counsel are expected to maintain an attitude of respect and deference toward the judge, and this attitude is maintained without difficulty when the judge confines his activities to the usual judicial duties. And the judge can more easily treat counsel with the respect due an officer of the court in the performance of a duty, if he avoids the performance of the duties incumbent properly upon an attorney representing one side of the case. The evidence taken as a whole, might be so conclusive of the defendant's guilt that

an appellate court would not be justified in interfering with the judgment on this account alone. But in a case where there is substantial conflict in the evidence as to the essential points that were required to be submitted to the jury, the course of the judge in unnecessarily assuming to perform the duties incumbent primarily upon others might make it the duty of an appellate court, on this ground alone, to grant a new trial." *United States* v. *Lanham* (5th Cir. 1969), 416 F. 2d 1140, 1145; *Adler* v. *United States* (5th Cir. 1910), 182 F. 464.

In the examination of another court appointed psychiatrist the trial judge again took on the appearance of an advocate. The following is the court's examination of Doctor Schmitt.

"Q  The first proposition is if he realizes the consequences of his act and knows the difference between right and wrong, is that right?

A  Yes.

Q  Would you say at that time that Paul Kennedy on November 28, 1961 did not know the difference between right and wrong?

A  Well, I feel that he probably did know the difference between right and wrong at that time.

Q  You think he did know?

A  Yes.

Q  Well then the next is, do you think that he had such resistance that he was able to resist his impulses to commit a crime or the crime?

A  My feeling there would be that he did not have sufficient restraint to resist the impulse.

Q  That, Doctor, is pretty much speculation on your part, is it not?

A  Yes, sir.

Q  What?

A  Yes, sir.

Q  In your report I notice you say 'At this time to state categorically what his state of mind was at the time of the incident must by its very nature be speculative.'

A  Yes, sir.

Q  And you are basing that pretty much on what you—what you—reports you received from Beatty Hospital?

A (Nod of head.) And my own examination.

Q And your own examination?

A (Nod of head; no oral response.)

Q From your own examination alone and not—deleting all that you know from Beatty Hospital records, what would you say?

A Well, from my own examination alone and assuming that what the information received from that patient was absolute truth, the fact that he was having—hearing voices that were telling him to kill someone prior to the incident and the fact that following the incident he was—it was found necessary to hospitalize him, I would have to state that he was ill at the time that he committed the act. I think the question in my own mind is the fact of my own feelings that one can know right from wrong on one hand and on the other hand however, might not be able to control his impulses to commit an act.

Q Well, Doctor, in your report to me you didn't make the conclusion that he could not resist his impulses, did you?

A No, I did not.

Q Why not?

A I think I indicated in my report, as it says here, 'Clinically, he was insane at the time of the incident' which is implying that one of the provisions of legal insanity certainly was not present?

Q Oh, let's see—on a historical basis appears to be he was actively hallucinating six weeks prior to the incident he was found incompetent to stand trial following the incident, and thus one might assume he was insane at the time of the incident.

A That's correct.

Q Is that what you are doing, assuming?

A Not having been there, not being able to examine him at the time, yes.

Q You have to assume that?

A Yes.

Q Then you can't definitely say that he did not have impulse to resist committing crime?

A I can't posivitely (sic) state anything. I think the good Lord's the only one that can do that.

Q And you say that 'Presently Mr. Kennedy appears to

be competent to stand trial', that you got from the report at Beatty Hospital?

A   No, I got that from my own examination at the time.

Q   You mean now to stand trial?

A   Yes.

Q   'Recognizes the difference between right and wrong and presently has sufficient willpower to control his impulses'?

A   Yes, sir.

Q   Is that your opinion now?

A   Yes, sir.

Q   That he knows the difference between right and wrong, can stand trial and he can control his impulses?

A   At the time of my examination, yes.

Q   But you're speculating on the question of whether he could at that time control his impulses, is that right?

A   Yes, sir.

Q   You're not positive?

A   No.

Q   Well, I don't want to—

A   I am relatively sure in my own mind, as I said, with the information presented to me, that this was truth, that he was not able to control his impulses at that time."

Then upon cross-examination of this witness by the defense the following exchange occurred.

"Q   Doctor, let me ask you this: then there very well could be a situation regarding this type of mental illness where an individual would not feel necessary endangered or persecuted by a police officer but he may feel endangered or persecuted by a housewife, isn't that possible?

A   It would depend on his specific symptoms, yes.

Q   In other words, whoever just happens to be there at that time and who he feels is endangering him or in a position to persecute him, he will act out aggressively possibly, is that true?

A   That's right. Like for example, the police officer in one circumstance one individual might view this as somebody who is an adversary and who was an enemy whereas in another circumstance with the same illness might view this as someone who was protective and helpful to him, so there's no way to specifically generalize and state that, you

know, a paranoid's going to be frightened of every police officer or he's going to be upset by every housewife. It is a totally individual thing.

THE COURT: Isn't that the way most police officers are killed?"

The following occurred during the Court's examination of Dr. Berkson, a psychiatrist and a defense witness.

"Q Doctor, based on your examination, the first two examinations of the defendant, how did you classify him as to his mental illness in your terminology?

A I thought he was a schizophrenic.

Q Was he a psychotic?

A I thought he was, yes.

Q Both, or what?

A Well, schizophrenia is a kind of psychosis. It's the name of a kind, of one group or psychoses.

Q Sociopathic. Is a schizophrenia a psychopath, sociopath?

A No.

Q Is a schizophrenic a psychotic, psychopathic?

A Some terms are getting mixed up.

Q *By me or you or by the general public, or the medical profession?"* (our emphasis)

Much of the foregoing clearly appears to be an attempt to impeach the expert witnesses who testified favorably for the defense. It also gives the impression that the judge doubts the credibility of these witnesses; this being done in the presence of the ever watchful jury. The judge has lost his appearance of impartiality. He has removed his robes and donned the cap of the prosecutor. This is especially serious in light of the fact that no such impeaching type of examination was conducted during the testimony of the one psychiatrist favoring the state's position.

Another occasion in which the court attempted to impeach a witness occurred during the examination by a defense witness concerning certain line-up identifications. Certain State's

witnesses had testified that they had identified defendant at a line-up. In an attempt to attack the credibility of this line-up identification, the defense introduced as a witness an attorney who had been deputy prosecutor at the time and who had been present at the line-up. He testified that defendant was clearly the tallest man in the line-up, the only one dressed in work type clothing, and no one else was within fifteen years of his age. After both the direct examination by the defense and the cross-examination by the state the judge conducted the following examination.

"Q You were Deputy Prosecuting Attorney of Porter County at that time?

A I was, Your Honor.

Q Why were you there? Were you there in capacity of deputy prosecuting attorney?

A I was.

Q. What was your purpose in being there?

A (No response.)

Q At this lineup.

A Well, for one thing, Your Honor, I had never seen one, and I'm sure part of my motive was curiosity. Partly, we had had a police officer killed, which was a matter of great concern, and there was a suspect in custody.

Q You wanted him identified, didn't you?

A Oh, yes.

Q Yes?

A Yes.

Q And you were there while this lineup was in progress?

A I was.

Q And while he was being identified?

A I was.

Q And if there was anything wrong with it, why didn't you say so?

A It was the Gary Police Department's operation first of all.

Q You were the deputy prosecuting attorney at that time?

A Yes.

Q  You were the one to prosecute that case, weren't you?

A  The prosecutor was; my office was.

Q  Yes, your office was?

A  (Nod of head; no oral response.)

Q  Isn't it your purpose to see that a proper identification is made at the time so that it can be proved in the trial of the case?

A  Yes, sir, I believe that to be a function of the prosecutor.

Q  Why didn't you object then if there was not proper identification and lineup made at that time?

A  Several reasons, Your Honor. One, I was really new and inexperienced. Secondly, I was in a strange forum. And, third, one's attitude isn't always objective in circumstances like this.

Q  You let it go by then because you were in strange territory, is that it?

A  I let it go by for all those reasons.

Q  Prosecuting Attorney Alfred Pivarnik was there, wasn't he?

A  Best of my recollection he was, yes.

Q  Didn't you see him there? You just testified he was there.

A  To the best of my recollection he was.

Q  Didn't he see the lineup?

A  I assume he did. Confident he did.

Q  He is Judge now of the Circuit Court?

A  Yes.

Q  How long had he been practicing before he was prosecuting attorney?

A  How long had he?

Q  Yes?

A  I would say four years.

Q  You are a law partner of Mr. Aungst's?

A  We share the same office space and share expenses. We are not technically partners as such.

Q  Isn't your partnership name—isn't he among the partnership name of Lyons, Aungst and Guastella?

A  We have a common letterhead. We are not partners in the sense we do not share income. We share expenses.

Q   Would you say that that lineup was wrong and that identification was made wrong?

A   I don't know the identification was wrong, Your Honor. Simply say nobody in the lineup in my opinion resembled the defendant.

Q   Is it your opinion then that they've got to scour around and find a fellow that looks like Paul Kennedy and bring him in there to confuse the people that are identifying him?

A   I would have to examine the law on the subject, Your Honor, to form an opinion.

Q   You would have to do what?

A   Examine the law on the subject in greater depth to form an opinion on that.

Q   Have to examine the law? You mean you have to examine the decisions that have come down recently by the United States Supreme Court in the last two years on identification?

A   I assume the court is asking me what my opinion is as to the legality of it, and I say I would have to examine the law to render an opinion of its legality.

Q   You were representing the State of Indiana at that time?

A   I was.

Q   It's your duty also to see that the rights of the defendant are protected at that time, isn't it?

A   I believe that to have been and now to be a function of the prosecutor.

Q   You didn't do that at that time, did you?

A   I believe what I did at the time or did not do at the time was justifiable under the circumstances.

Q   Did you or Prosecuting Attorney Pivarnik at that time say, 'Here, here, you're not doing this right,' and stop the lineup and stop the identification?

A   I did not, Your Honor. I know of no one who did.

Q   Did you hear anybody do it?

A   I heard of no one who did.

THE COURT:   That's all."

Such an extensive attempt at impeachment was clearly improper.

It is true that a trial judge may in any case, within reasonable limits, interrogate a witness. However, this should never be done in a manner which would improperly influence the jury. *Dombkowski* v. *State* (1967), 249 Ind. 32, 230 N. E. 2d 602; *Rhodes* v. *State* (1930), 202 Ind. 159, 172 N. E. 176. The purpose of the judge's discretionary power to examine witnesses is to be an aid to the jury in its fact finding duties, however this must be done in an impartial manner so that the judge does not improperly influence the jury with his own contentions. *Thomas* v. *State* (1967), 248 Ind. 447, 229 N. E. 2d 722; *Dombkowski* v. *State, supra.* Care should be exercised to avoid indirect expression of opinion by the trial judge, and it is improper for the trial judge to ask questions which are reasonably calculated to impeach or discredit the witness or his testimony. Canon 8 of the Code of Judicial Conduct and Ethics reads in part:

> "A judge may properly intervene in a trial of a case to promote expedition, and prevent unnecessary waste of time, or to clear some obscurity, but he should bear in mind that his undue interference, impatience, or participation in the examination of witnesses, or a severe attitude on his part toward witnesses may tend to prevent the proper presentation of the cause, or the ascertainment of the truth in respect thereto."

A jury of laymen will often have an awesome respect for the institution of the American trial judge. This can lead them to accord great and perhaps decisive significance to the judge's every word and intimation. It is therefore essential that the judge refrain from any actions indicating any position other than strict impartiality.

Although most likely inadvertent, the trial judge in the case at bar appears to have abandoned his position of impartiality and neutrality, which, especially in light of the closeness of the insanity issue, was extremely detrimental to appellant's cause. This being so, the necessity for a new trial is manifest.

The judgment is reversed and appellant's prayer for a new trial is granted.

Judgment reversed.

DeBruler, Givan and Prentice, JJ., concur; Arterburn, C. J., concurs in result.

NOTE.—Reported in 280 N. E. 2d 611.