## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 01 2018, 8:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Augustus Mendenhall,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

November 1, 2018

Court of Appeals Case No.
18A-PC-230

Appeal from the Hamilton Circuit Court

The Honorable Paul A. Felix, Judge

Trial Court Cause No.
29C01-1304-PC-2849

**Baker, Judge.**

[1] Augustus Mendenhall[1] appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that he was deprived of the effective assistance of counsel at numerous times throughout his trial for Class A Felony Attempted Murder, Class B Felony Robbery Resulting in Serious Bodily Injury, Class B Felony Aggravated Battery, Class B Felony Criminal Confinement, and Class A Misdemeanor Resisting Law Enforcement.

[2] Mendenhall argues that his defense attorney was ineffective by (1) failing to object to prosecutorial misconduct; (2) failing to object to alleged judicial misconduct; and (3) failing to elaborate on potential defenses and to request proper jury instructions. Finding no error, we affirm.

# Facts

[3] The parties to this case have a long and storied past. In 1983, Burke Mendenhall (Burke), a real estate developer and Mendenhall's father, leased property within the Lafayette Square region in Indianapolis to a tenant who planned to open an adult bookstore. Edward DeLaney, an attorney and current member of the Indiana House of Representatives, was working for the firm of Barnes & Thornburg[2] during this period. DeLaney filed a lawsuit on behalf of

---

[1] Prior to this post-conviction appeal, we handed down an opinion from a direct criminal appeal by Mendenhall in which he argued that his five convictions should be overturned. *Mendenhall v. State*, 963 N.E.2d 553 (Ind. Ct. App. 2012). We affirmed all the convictions, but we remanded with instructions to reduce Mendenhall's robbery conviction to a Class C felony. *Id*. at 573.

[2] In 1983, the firm was called Barnes, Hickman, Pantzer & Boyd.

his client, the DeBartolo Corporation, which owned Lafayette Square Mall and initially sold the Lafayette Square property to Burke. The DeBartolo Corporation sought an injunction to bar Burke's tenant from opening the adult bookstore.

[4] This litigation placed a huge financial strain on Burke and his family. Burke frequently informed Mendenhall about his ongoing legal and pecuniary woes and about how much he despised DeLaney.

[5] Mendenhall believed his father and carried this hatred for DeLaney with him into adulthood. In October 2009, Mendenhall, an attorney himself, posed as Victor White, a fictitious individual who claimed to represent Russian businesspeople who were interested in buying real estate in Carmel. Mendenhall, while posing as Victor White, contacted DeLaney and asked if he would be interested in representing these businesspeople in their transactions. DeLaney stated that he would potentially advise them given his fluency in the Russian language; the two met on October 31, 2009, at a church on North Meridian Street. DeLaney and Mendenhall drove together to the area in Carmel that Mendenhall's "clients" were interested in.

[6] While riding in DeLaney's car, Mendenhall asked him to abruptly stop the vehicle, pulled out a gun wrapped in a plastic bag, and pointed it at DeLaney. Mendenhall then asked DeLaney a series of questions about whether DeLaney had a good relationship with God and if he had ever used the legal system to

hurt people. At that point, DeLaney's vehicle was stopped in a neighborhood in Carmel.

[7] Soon thereafter, a car pulled up, and Kathy Palmer, a former secretary at Barnes & Thornburg whom DeLaney knew, and her husband asked if something was wrong. DeLaney kept strangely pointing and winking to indicate that he was in trouble. Concerned, the Palmers left and decided to call 911.

[8] Mendenhall directed DeLaney to park the car behind a row of trees and bushes. DeLaney escaped the car and slammed the door on Mendenhall. Mendenhall got out of the car, tackled DeLaney, and pinned him down to the ground. Mendenhall proceeded to beat DeLaney on the right side of his head.

[9] Carmel Police Officers David Kinyon and James Herron responded to the Palmers' 911 call. The officers found Mendenhall beating DeLaney, identified themselves as police officers, and exited their vehicles to stop the altercation. Mendenhall attempted to flee but was struck in the back by Officer Kinyon's taser three times. The officers arrested Mendenhall. DeLaney suffered significant injuries from Mendenhall's attack, including multiple fractures to his eyes and ribs.

[10] The State charged Mendenhall with Class A felony attempted murder, Class A felony robbery resulting in serious bodily injury, Class B felony aggravated battery, Class B felony criminal confinement, and Class A misdemeanor resisting law enforcement.

[11] The trial court appointed an attorney to represent Mendenhall at trial. His counsel raised two defenses at his September 8, 2010, trial: (1) that Mendenhall was completely innocent and never intended to kill DeLaney; and, if the jury did not accept the first defense, (2) that mental illness rendered Mendenhall unable to appreciate the wrongfulness of his actions.

[12] During the voir dire phase of the trial, the prosecution referred to the possibility that Mendenhall was feigning his mental illness like the film character Ferris Bueller. PCR Tr. Vol. II p. 132-33. The prosecution also alluded to a case where a man claimed to be legally insane because he overconsumed Twinkies. *Id.* The trial lasted eight days and consisted of long diatribes, a frustrated judge, and a constant battle to lay the foundation for different expert witnesses and to admit their respective testimonies. *Id.*

[13] On September 16, 2010, the jury found Mendenhall guilty but mentally ill on all five counts. The trial court sentenced him to forty years' incarceration; on appeal, this Court reduced Mendenhall's robbery conviction to a Class C felony but otherwise affirmed the trial court's judgment. *Mendenhall*, 963 N.E.2d at 573.

[14] On November 5, 2013, Mendenhall filed an amended petition for post-conviction relief, alleging that his counsel had been ineffective. He maintains that he was deprived of his Sixth and Fourteenth Amendment rights to a fair trial, an impartial jury, and proper legal representation. A post-conviction relief evidentiary hearing took place on October 12, 2017, at which Mendenhall

requested a new trial. On January 2, 2018, the post-conviction court denied his request for relief. Mendenhall now appeals.

# Discussion and Decision

# I. Standard of Review

Mendenhall appeals the denial of his request for post-conviction relief, arguing that he was denied the effective assistance of counsel during his trial. He asserts that any one of his claims evaluated either individually or in the aggregate denied him his Sixth Amendment rights to a fair trial, an impartial jury, and proper legal representation. *See Williams v. State*, 508 N.E.2d 1264, 1268 (Ind. 1987) (holding that "while each error of counsel individually may not be sufficient to prove ineffective representation, an accumulation of such failures may amount to ineffective assistance"). He puts forward three major claims on review:[3] (1) that counsel failed to object to prosecutorial misconduct; (2) that

---

[3] Mendenhall claims upwards of twelve to thirteen instances of ineffectiveness of counsel, many of which lack cogency and/or merit. Arguments that we reject outright are as follows:

(1) Counsel's failure to object to DeLaney's supposed perjured statements. Mendenhall has waived this issue because he failed to raise it in his amended petition for post-conviction relief. PCR App. Vol. II p. 74-79. *See Allen v. State*, 749 N.E.2d 1158, 1167 (Ind. 2001). The post-conviction court made no findings of fact or conclusions law regarding this issue, so we decline to address it in this appeal.

(2) Counsel's failure to disclose a supposedly "exculpatory" chapter from the book *Fight Club*. Though Mendenhall claims this information is material, we find it simply extraneous and unavailing.

(3) Counsel's failure to object to the order of witness testimony. We already decided, adversely to Mendenhall, that not only did he waive any claim regarding order of witnesses but also that any argument put forth was unpersuasive. *Mendenhall*, 963 N.E.2d at 566-69. Issues raised on direct appeal, and decided adversely, are res judicata, and not available in post-conviction proceedings.

counsel failed to object to alleged judicial misconduct; and (3) that counsel failed to elaborate on potential defenses and to request proper jury instructions.

[16] For post-conviction proceedings, the petitioner bears the burden of establishing grounds for post-conviction relief by a preponderance of the evidence. *Helton v. State*, 907 N.E.2d 1020, 1023 (Ind. 2009). A petitioner must show that the evidence unerringly and unmistakably leads to a conclusion opposite that reached by the post-conviction court. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind. 1993).

[17] For a claim of ineffective assistance of counsel, we use a two-part test. To satisfy the first prong, the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the "counsel" guaranteed by the Sixth Amendment. *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017); *see generally Strickland v. Washington*, 466 U.S. 668 (1984). To satisfy

---

*Timberlake v. State*, 753 N.E.2d 591, 597-98 (Ind. 2001); *see also Rouster v. State*, 705 N.E.2d 999, 1003 (Ind. 1999).

(4) Counsel's failure to call expert witness Dr. Karen Fuller to present potentially exculpatory evidence. Mendenhall has waived this issue because he failed to raise it in his amended petition for post-conviction relief. PCR App. Vol. II p. 74-79. *See Koons v. State*, 771 N.E.2d 685, 691-92 (Ind. Ct. App. 2002). The post-conviction court only briefly mentioned and dismissed this issue, so we decline to address it in this appeal.

(5) Counsel's failure to thoroughly question Mendenhall about his true motive and intent. Though Mendenhall claims that counsel failed to let him testify about what his true motives were, he offers no evidence that counsel's questioning—or alleged lack thereof—severely tarnished his image to the jury. Therefore, we decline to address it now. This is simply another argument that attempts to circumvent the wide latitude given to counsel in terms of how he questions or does not question his witnesses.

the second prong, the defendant must show prejudice: a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's errors, the result of the proceeding would have been different. *Id*.

There is already a strong presumption that an attorney exercises adequate judgment in his representation, and we are reluctant to second-guess the professional decisions and strategic choices of counsel in hindsight. *See Pennycuff v. State*, 745 N.E.2d 804, 811 (Ind. 2001). Any judicial scrutiny of counsel's performance is highly deferential, and poor strategy or tactics utilized by counsel during trial do not necessarily constitute ineffectiveness. *Id*.

# II. Prosecutorial Misconduct

Mendenhall first argues that his defense counsel did not properly object to alleged prosecutorial misconduct. We will first determine if there was actual prosecutorial misconduct. If there was no misconduct, then there is no merit to Mendenhall's claim that counsel should have objected.

To show prosecutorial misconduct, the defendant must show that the alleged misconduct (1) constituted a clearly blatant violation of basic and elementary principles of due process; (2) presented an undeniable and substantial potential for harm; and (3) made a fair trial impossible. *Washington v. State*, 902 N.E.2d 280, 290 (Ind. Ct. App. 2009). Moreover, the alleged misconduct must have subjected the defendant to grave peril and had a probable persuasive effect on the jury's decision. *Id*.

# A. Voir Dire

[21]  First, Mendenhall argues that statements made by the prosecution during voir dire rise to the level of misconduct. To Mendenhall, the prosecution indoctrinated members of the jury by alluding to "Ferris Bueller," "Twinkies," and the possibility that Mendenhall was faking his mental illness. We find this argument unavailing.

[22]  It can hardly be said that the prosecution's statements constituted a blatant violation of basic and elementary principles of due process. During voir dire, the State's attorney is not permitted to try the case or engage in questioning that is "clearly improper [or] . . . calculated to prejudice [a] fair trial[]." *Robinson v. State*, 297 N.E.2d 409, 411 (Ind. 1973). Here, however, the prosecution was highlighting Mendenhall's claim that he suffered from a mental illness. This was a reasonable strategy on the part of the prosecution to determine how potential jurors felt about insanity pleas and mental illness in general rather than a plan to prejudice the jurors.

[23]  Furthermore, there is no evidence to conclude that raising these points during voir dire presented an undeniable and substantial potential for harm. In fact, the jury ultimately returned a conviction of guilty but mentally ill, demonstrating that the jury was persuaded enough to designate Mendenhall as mentally ill when he committed his actions. If anything, the prosecutor's comments added to the trial's overall discussion about mental illness, and there is no compelling

evidence that such comments made a fair trial impossible. As such, defense counsel was not ineffective for failing to object during voir dire.

# B. Opening and Closing Statements

[24] Second, Mendenhall claims that certain comments made by the prosecution during its opening and closing statements constituted misconduct.

[25] Mendenhall points to the incorrect statements the prosecution made about how DeLaney saw a "double-feed malfunction" from the gun while inside the car. Appellant's Br. p. 26. This assertion was unsubstantiated and later proven to be incorrect. Mendenhall cites potential violations of professional conduct and evidentiary rules, but we are tasked with evaluating whether this erroneous stunt made by the prosecutor blatantly violated Mendenhall's due process rights and made it impossible for him to have a fair trial. We cannot say that it did. There is no indication that this lone comment unfairly shifted the jury or so up-ended the legal proceedings that Mendenhall was placed in grave peril. Therefore, the statement did not amount to misconduct and counsel was not ineffective for failing to object.

[26] Mendenhall also argues that peculiar references made by the prosecution in its closing and rebuttal statements rose to the level of misconduct. These references include images of the September 11, 2001, terrorist attacks, child marriages in Yemen, female infanticide in India and China, and child prostitution in Honduras. Trial Tr. p. 1041, 1044. While bizarre and seemingly unrelated to

the facts of the case at hand, there was no misconduct in making these statements. The prosecution mentioned the 9/11 attacks in response to comments made by the defense in its closing statement referencing the same event. *Id*. at 1028. Prosecutors can respond to allegations and inferences raised by the defense even if the prosecutor's response would otherwise be objectionable. *Cooper v. State*, 854 N.E.2d 831, 836 (Ind. 2006).

[27] The comments the prosecution made about infanticide, child marriages, and child prostitution, while strange and tangential in nature, also did not amount to misconduct. The prosecution referenced those horrific things to talk about morality, the need to abide by the rule of the law, and how Mendenhall, as an attorney, should have known better than to commit attempted murder. While these comments no doubt casted a shadow on Mendenhall's character, and we encourage prosecutors to exercise more restraint than what occurred here, the statements did not deprive him of a fair trial.

[28] Notwithstanding the fact that there was no legitimate prosecutorial misconduct, the standard for determining if trial counsel was ineffective for failure to object is whether the trial court would have been required to sustain the objection had one been made, or, conversely, whether the trial court would have committed prejudicial error if it overruled the objection. *Ross v. State*, 877 N.E.2d 829, 835 (Ind. Ct. App. 2007). At no moment during either voir dire or the opening and closing phases of the trial would the trial court have been required to sustain an objection—had one been made—to the prosecutor's statements. Mendenhall's argument fails on this front as well.

[29] Most importantly, counsel admitted that he did not object to any alleged prosecutorial misconduct throughout the trial because he thought it was "impolite," PCR tr. vol. II p. 121, and because it was not his style. Once again, we defer heavily to the tactics and strategies employed by counsel at the time of trial, and we begin with the presumption that counsel adequately represents his client to the best of his abilities.

[30] We cannot conclude that any of the actions committed by the prosecution amounted to prosecutorial misconduct. Therefore, counsel was not ineffective by not objecting to highlighted statements of the prosecutor.

# III. Judicial Misconduct

[31] Mendenhall next argues that counsel did not properly object to perceived judicial bias from the judge presiding over his trial. Mendenhall claims the judge repeatedly made inappropriate comments, showed "disdain" and hostility in demeanor, appellant's br. p. 38, and uniformly agreed with the State's position and wholly disagreed with the defense's position.

[32] As with prosecutorial misconduct, we will first determine if there was judicial bias or misconduct. If there is no showing of judicial misconduct, it cannot be found that counsel was ineffective for failing to object.

[33] A trial before an impartial judge is an essential element of due process. *Everling v. State*, 929 N.E.2d 1282, 1287 (Ind. 2010). To determine if a trial judge is impartial, we will examine "the judge's actions and demeanor while

recognizing the need for latitude to run the courtroom and maintain discipline and control of the trial." *Id.* at 1288; *see, e.g., Timberlake v. State*, 690 N.E.2d 243 (Ind. 1997). A defendant's due process rights have been violated if he can show multiple instances of judicial partiality or misconduct. *Stellwag v. State*, 854 N.E.2d 64, 69 (Ind. Ct. App. 2006). With this standard in mind, we find that there was no judicial misconduct present during Mendenhall's trial.

[34] One of the defense's expert witnesses was Dr. Solomon Fulero. Mendenhall complains that certain comments made by the judge when the defense was establishing Dr. Fulero's background were partial and only served to undermine the expert witness's credibility. For one, the judge understandably grew impatient with the doctor and asked if Dr. Fulero "[w]ould . . . just answer the question." Trial Tr. p. 754. Also, the judge appeared to snap at counsel when he did not accurately hear something that the judge said at some point, saying, "One more crack like that and I'll sanction him in front of the jury," and, "I don't appreciate your little episode." Trial Tr. p. 805. While these comments might seem inflammatory in hindsight, they can hardly be said to arise to the level of judicial misconduct.

[35] As we have already discussed, judges are given wide latitude in running their courtrooms and in maintaining proper decorum, and we are hesitant to second-guess a judge's actions when conducting a trial. Thus, the trial judge for Mendenhall's criminal trial was well within his right to snap at witnesses who avoided attorneys' questions and to criticize behavior that the judge saw as out-of-line.

[36] More to the point, Mendenhall offers no evidence that the judge's behavior so unfairly deprived Mendenhall of a fair and impartial trial aside from his own gut feelings that the judge's actions demonstrated agreement with the State's position on every matter. Though he claims that the judge displayed obvious disdain and antipathy towards the defense's witnesses, appellant's br. p. 38, Mendenhall cannot prove that the jury or even the trial overall was so unfairly colored by the judge's attitude that he was deprived of due process.

[37] Mendenhall points us to *Kennedy v. State*, 258 Ind. 211, 280 N.E.2d 611 (1972), to demonstrate what true judicial partiality looks like. Mendenhall argues that the case is not only illustrative, but also bears a striking similarity to what happened during his trial. In *Kennedy*, the judge repeatedly examined the expert witness with relentless questions about his credentials and ability to testify accurately. *Id*. at 217, 280 N.E.2d at 615. We determined that the judge's method of questioning casted serious doubts as to the witness's credibility due to the judge's highly argumentative manner. In effect, the judge "lost his appearance of impartiality . . . [and] removed his robes and donned the cap of the prosecutor." *Id*. at 222, 280 N.E.2d at 618. This sort of questioning and clear lack of judicial impartiality in the presence of the jury simply did not happen in the instant case. At most, the judge understandably became frustrated on several occasions and grew agitated primarily with the attorneys who delayed in laying the foundation for their witnesses. The judge did not agree uniformly with the State's position by donning any prosecutorial cap, and he

certainly did not wholly dismiss the arguments and evidence proffered by the defense.

[38] For the foregoing reasons, we conclude that there was no judicial bias that would have deprived Mendenhall of his due process rights. Therefore, any claim that counsel was ineffective by not objecting to perceived claims of judicial bias is unavailing.

# IV. Counsel's Failures

[39] Mendenhall finally argues that counsel failed at three specific moments to elaborate on potential defenses and to request the proper jury instructions. Specifically, Mendenhall claims that: (1) counsel failed to ask for a jury instruction regarding whether the gun safety was off; (2) counsel failed to bring up a certain defense after introducing the idea in his opening argument; and (3) counsel failed to request an instruction on the definition of "wrongfulness" for the jury. We will address each claim in turn.

[40] First, one of Mendenhall's defenses was that his gun safety was on during the altercation, showing that he did not intend to kill DeLaney. He claims that counsel should have asked for a jury instruction regarding whether the gun safety was off.

[41] While Mendenhall is correct in pointing out that a criminal defendant is entitled to have a jury instruction on any theory or defense which has some foundation in the evidence, *Toops v. State*, 643 N.E.2d 387, 389 (Ind. Ct. App.

1994), the decision of whether to request that jury instruction lies solely with the attorney proposing it. To show ineffectiveness of counsel, Mendenhall must show us that counsel's representation on this point fell below a level of objective reasonableness. We hold that it does not. At no point is an attorney required to request a certain jury instruction regarding a minor point of his or her case. Counsel stated that he was not aware that such a jury instruction was available, PCR tr. vol. II p. 108, and it cannot reasonably be said that his lack of awareness of this fact so unduly prejudiced Mendenhall's case that the jury was swayed another way. Furthermore, a reasonable juror would know what a safety is and what it means for a gun to have the safety on, so this lack of a jury instruction was not a lynchpin that would ultimately make or break Mendenhall's defense.

[42] Second, counsel introduced the concept of a "deific decree defense" in his opening argument. This is a defense for when the person who committed the crime claims that God ordered him to do it. *Id*. at 149. Mendenhall claims that counsel was ineffective because he failed to readdress this defense after initially introducing the idea. Mendenhall argues that by not returning to a specific mental insanity defense that was mentioned in his opening statement, counsel, in effect, abandoned any discussion of mental insanity and then unfairly prejudiced Mendenhall because the jury would not consider deific decree as a possibility. However, throughout the trial, counsel attempted to paint Mendenhall as a mentally unstable individual whose delusions about God and morality led him to commit these acts.

[43]     Moreover, there is no definitive legal standard that compels an attorney to return to arguments or claims made in an opening argument lest he be deemed ineffective in his representation. Mendenhall would have us impose on all attorneys a requirement to refer to every argument made in an opening statement. Not only do we refuse to do so, but such an imposition contravenes the principle that we defer to attorneys who know what is best for their clients. Counsel even admits that the deific decree defense was probably not a good defense to pursue because it was "not accepted very much." *Id.* As such, we defer to counsel and assume that he made a reasonable judgment to abandon the deific decree defense

[44]     We also note that Mendenhall was not prejudiced by counsel's perceived omission. The jury returned a guilty but mentally ill verdict on all counts, meaning the jury accepted counsel's overall proposition that Mendenhall suffered from delusions that led him to almost killing DeLaney. Absent mention of the deific decree defense, counsel's overall argument neither benefitted nor disadvantaged Mendenhall since his criminal sentence would have been the same no matter how the jury classified him.[4]

[45]     Finally, an insanity defense depends on whether the defendant appreciates the wrongfulness of his actions. *Galloway v. State*, 938 N.E.2d 699, 717 (Ind. 2010). Mendenhall claims that counsel was ineffective because he failed to request an

---

[4] *See* Ind. Code § 35-36-2-5(a).

instruction on the definition of "wrongfulness" for the jury. He argues that he was "undoubtedly prejudiced by the failure to define wrongfulness," appellant's br. p. 58, because the jury would have been confused as to whether wrongfulness meant being legally or morally wrong.

[46] Here, there is no evidence to suggest that the jury determined that "wrongfulness" was synonymous with "illegal." The defense presented numerous expert witnesses who testified to Mendenhall's mental state and how he felt morally bound to do something about DeLaney and the alleged pain this man inflicted upon his family. The jury could have clearly discerned from this presentation that wrongfulness equated with moral wrongfulness and more than just illegal conduct. There is no definitive evidence or legal standard that would lead us to believe that this omission of a clearer definition of wrongfulness unduly prejudiced Mendenhall nor that counsel was ineffective as an attorney for failing to request such an instruction.

# Conclusion

[47] No evidence leads us to a conclusion opposite that reached by the post-conviction court; there was no ineffectiveness of counsel that deprived Mendenhall of his Sixth Amendment rights to a fair trial, an impartial jury, or adequate representation of counsel either in any individual claim or in the aggregate.

[48]     The judgment of the post-conviction court is affirmed.


Robb, J., and Crone, J., concur.