## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 25 2019, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Leanna K. Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Martell Williams,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 25, 2019

Court of Appeals Case No.
19A-CR-115

Appeal from the Marion Superior Court

The Honorable Mark D. Stoner, Judge

Trial Court Cause No.
49G06-1710-MR-41035

**Bailey, Judge.**

# Case Summary

Martell Williams ("Williams") appeals his convictions for three counts of Murder, felonies,[1] and one count of Robbery, as a Level 5 felony.[2] We affirm.

# Issues

Williams presents eight issues for review:

I.     Whether he is entitled to discharge under Indiana Criminal Rule 4;

II.     Whether sufficient evidence supports his convictions;

III.     Whether the trial court abused its discretion in evidentiary rulings;

IV.     Whether the trial court became an advocate for the State to achieve admission of a video;

V.     Whether the trial court's imposition of consecutive sentences is an abuse of discretion;

VI.     Whether his aggregate sentence is inappropriate pursuant to Indiana Appellate Rule 7(B);

---

[1] Ind. Code § 35-42-1-1(2).

[2] I.C. § 35-42-5-1.

VII.  Whether his Robbery conviction must be vacated under the continuous crime doctrine; and

VIII.  Whether he, as an indigent defendant, is entitled to a transcript at public expense.

# Facts and Procedural History

In 2017, Sha-Lynn Poindexter ("Poindexter"), Jordan Wright ("Wright"), Justin Crowder ("Crowder"), and Dominique Miller ("Miller") shared an apartment in Indianapolis.  Crowder's girlfriend, Zoe Radford ("Radford") was a frequent visitor.

Crowder supplemented his income by selling marijuana.  One of his regular customers was a resident of the same complex, Sean Jones ("Jones").  Jones became aware that Crowder kept a safe and a gun in his apartment, and Jones suspected that the safe contained cash and marijuana.  Jones and his friend, Stanley Williams ("Stanley"), began to discuss robbing Crowder.

On July 16, 2017, Jones contacted Devante Gilbert ("Gilbert") to convey that he "wanted to rob someone" and needed a driver.  (Tr. Vol. IV, pg. 117.)  Gilbert agreed to be the driver.  Jones also texted Stanley that he had been "casing [Crowder's apartment] all day" and needed "help [to] get some guns for this robbery."  (Tr. Vol. V, pg. 209.)  Stanley then called Williams, and Williams called Troy Ward ("Ward").  Gilbert drove to pick up each of the others; when Williams and Ward approached the vehicle, they were carrying backpacks with weapons inside.

[6]     Gilbert drove back to Somerset Bay Apartments, where he had first picked up Jones, and backed into a parking space near Crowder's apartment. Gilbert and Stanley remained in the vehicle. Jones used a code to access Crowder's apartment building[3] and walked up the stairs, with Williams and Ward crouching beside him. Jones knocked on the door and, when it was opened, the trio pushed their way inside.

[7]     In a bedroom, Poindexter heard gunshots. Wright armed himself with a sword and told Poindexter to hide; he then left the room. Poindexter hid between two dog crates, emerging when Radford came running into the room saying that "everyone was shot." (Tr. Vol. II, pg. 161.) In the dining room and living room, Miller, Wright, and Crowder lay dead from gunshots wounds to the head.

[8]     Jones, Williams, and Ward returned to Gilbert's vehicle. Jones had a wad of cash and an assault rifle, which he placed in the trunk. Ward was carrying a safe. Gilbert drove to a wooded area and everyone exited the vehicle with a plan to open the safe. However, Gilbert and Jones soon left to seek assistance because Jones had been shot and could not staunch the bleeding. Ward fired shots at the safe and it eventually opened. It was empty. The empty-handed trio walked to a nearby Target store and got rides to home and work.

_____

[3] Jones explained that he had learned the maintenance code that permitted access to multiple buildings, after a family friend lost her key and was provided with the code.

[9] In the ensuing police investigation, Radford identified Jones as one of the intruders. Jones, who had been shot and was receiving treatment at Methodist Hospital in Indianapolis, was arrested the following day. He confessed to his involvement in the murders and robbery, and implicated Williams, Ward, Gilbert, and Stanley. Ultimately, Gilbert, Stanley, and Jones each entered a plea bargain with the State, agreeing to plead guilty to a felony other than Murder and provide testimony in the prosecution of Williams and Ward.

[10] Williams and Ward were tried before a jury on October 9 through October 15, 2018, on charges of Murder, Robbery, and Carrying a Handgun without a License. The jury convicted Williams as charged, but to avoid double jeopardy concerns, the trial court did not enter a judgment of conviction upon the latter charge and entered the Robbery conviction as a Level 5 felony. Upon his conviction for three counts of Murder, Williams received consecutive sentences of fifty-five, forty-five, and fifty-five years. Upon his conviction for Robbery, Williams received a concurrent sentence of five years, thus providing for an aggregate sentence of 145 years. He now appeals.

# Discussion and Decision

## Motion for Discharge – Criminal Rule 4

[11] Williams's trial was initially set for June 25, 2018. At a June 19, 2018 pretrial conference, the State and defense counsel made a joint motion to continue the trial. The trial was set for August 20, 2018. At the same pretrial conference, after a continuance was requested but the trial date had not been set, Williams

requested a speedy trial. The trial court acknowledged that both defendants had requested an early trial date pursuant to Criminal Rule 4(B)(1) (requiring the trial of an incarcerated defendant within seventy days) and noted "70th day should be the 28th of August." (Tr. Vol. II, pg. 12.)

[12] At a July 31, 2018 pretrial conference, the August trial setting was confirmed. At a pretrial conference on August 17, 2018, the State moved for a continuance to permit the Marion County Cyber Crimes Unit to conduct additional investigation related to cell phone contact between some of the alleged co-conspirators.

[13] The trial court granted the State's motion for a continuance despite Williams's assertion of his speedy trial rights, finding that delay attributable to the jointly requested continuance was chargeable to Williams. The trial court reasoned that a defendant "cannot ask for a continuance and ask for a speedy trial simultaneously" and the seventy-day computation as to Williams "does not go to the day the request is made," June 19, 2018, but rather began on the agreed-upon trial date of August 20, 2018. (Tr. Vol. II, pg. 47.) After providing its reasoning, the trial court reset the trial for October 9, 2018.

[14] An accused's right to a speedy trial is guaranteed by Article 1, Section 12 of the Indiana Constitution and by the Sixth Amendment to the United States Constitution. *Leek v. State*, 878 N.E.2d 276, 277 (Ind. Ct. App. 2007). Criminal Rule 4 was adopted to implement this speedy trial right. *Id.* Williams

unsuccessfully moved for discharge pursuant to Criminal Rule 4(B)(1), which provides in pertinent part:

> If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion, except where a continuance within said period is had on his motion, or the delay is otherwise caused by his act, or where there was not sufficient time to try him during such seventy (70) calendar days because of the congestion of the court calendar.

Williams claims that his June 19, 2018 motion started the seventy-day clock, and he did not thereafter cause any delay but remained ready for the August trial setting; thus, the October trial setting violated his speedy trial rights and he is entitled to discharge.

[15] A trial court's decision denying a motion for discharge under Criminal Rule 4 is reviewed for clear error, after according the trial court's findings reasonable deference. *Austin v. State*, 997 N.E.2d 1027, 1040 (Ind. 2013). Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *Id.* Where the issue is a question of law applied to undisputed facts, the review is de novo. *Id.* at 1039. Here, the parties do not dispute the facts. Williams requested a continuance, the grant of which reset his trial to August 20, 2018. The same day, he requested a speedy trial.

[16] Criminal Rule 4(F) provides for an extension of time as follows:

> When a continuance is had on motion of the defendant, or delay in trial is caused by his act, any time limitation contained in this

rule shall be extended by the amount of the resulting period of such delay caused thereby.

[17] Williams focuses solely upon the timing of his motion for a speedy trial. In the specific sequence of events, Williams requested a continuance before the trial date was set, and before making his motion for a speedy trial. But Criminal Rule 4 "makes no distinction regarding when the trial date is set" and "delays caused by action taken by the defendant are chargeable to the defendant regardless of whether a trial date has been set." *Cook v. State*, 810 N.E.2d 1064, 1067 (Ind. 2004). And Criminal Rule 4(B)(1) contemplates a "continuance within said period" that is "had on [defendant's] motion" and does not specify that the motion must be made within the seventy-day period.

[18] The salient fact here is that Williams initiated the delay that took place after his motion. Williams cannot receive a continuance without accountability. *See Brown v. State*, 725 N.E.2d 823, 825 (Ind. 2000) ("The objective of the rule is to move cases along and to provide the defendant with a timely trial, not to create a mechanism to avoid trial.") The delay up until August 20, 2018 was chargeable to Williams and the seventieth day thereafter was October 29, 2018. Williams was tried within this period; therefore, he is not entitled to discharge.

## Sufficiency of the Evidence

[19] To convict Williams of murder, as charged, the State was required to prove beyond a reasonable doubt that Williams killed Wright, Crowder, and Miller while committing or attempting to commit robbery. I.C. § 35-42-1-1. To

convict Williams of robbery, as charged, the State was required to prove beyond a reasonable doubt that Williams knowingly or intentionally took a safe or firearm from Crowder by the use or threat of force.  I.C. § 35-42-5-1.

[20] When reviewing a challenge to the sufficiency of the evidence, we neither reweigh evidence nor judge witness credibility.  *Gibson v. State*, 51 N.E.3d 204, 210 (Ind. 2016).  We view the "evidence and reasonable inferences drawn therefrom in a light most favorable to the conviction, and will affirm 'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'"  *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013) (quoting *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004)).

[21] Williams does not claim that the State failed to present evidence to establish any element of the charged crimes.  Rather, he argues that much of the testimony against him should be disregarded because the occurrence witnesses – Jones, Stanley, and Gilbert – were motivated to falsely identify him.  That is, they needed to please prosecutors who had extended lenient plea offers.  According to Williams, Jones eventually received a sentence of thirty years imprisonment, while Stanley and Gilbert each received a nine-year sentence.

[22] Williams also argues that the trio's testimony contained discrepancies and was inconsistent with a neighbor's testimony that she had seen only two men fleeing the apartment building.  He contends that the testimony of Jones, Stanley, and Gilbert "cannot withstand scrutiny."  Appellant's Brief at 25.  At bottom,

Williams is asking that we judge witness credibility and reweigh evidence. We cannot do so. *Gibson*, 51 N.E.3d at 210.

## Evidentiary Rulings

[23] Williams argues that the trial court made "several serious evidentiary mistakes," including the failure to exclude, as a discovery sanction, "phone records given to the defendants on the eve of their speedy trial date," and the exclusion of evidence that Jones and Gilbert had once before robbed a drug dealer. Appellant's Brief at 30.

[24] Questions regarding the admission or exclusion of evidence are entrusted to the sound discretion of the trial court. *Harrison v. State*, 32 N.E.3d 240, 250 (Ind. Ct. App. 2015). We review the court's decision only for an abuse of discretion. *Id.* A trial court abuses its discretion if its decision is clearly against the effect of the facts and circumstances before it, or if it misinterprets the law. *Id.*

[25] Also, a trial court has broad discretion regarding discovery violations, and its ruling will be reversed only for an abuse of that discretion involving clear error and resulting prejudice. *Berry v. State*, 715 N.E.2d 864, 866 (Ind. 1999). In general, the proper remedy for a discovery violation is a continuance. *Id.* Exclusion of the evidence is an extreme remedy that is to be used only if the State's actions were deliberate and the conduct prevented a fair trial. *Id.*

[26] Jones, Stanley, and Gilbert testified regarding contacts on the day of the murders among themselves and Williams and Ward, using Snap Chat, text messages, and cellular phone calls. The testimony was that Jones and Stanley

agreed to meet up, Jones contacted Gilbert, Stanley contacted Williams, and Williams contacted Ward. Some of the testimony of the various communications was corroborated by cell phone records. There was also testimony that Jones, Gilbert, Ward, Williams, and Stanley traveled together to the apartment where the murders took place. This was partially corroborated by mapping cell phone tower locations nearest the cell phones of many of the participants[4] near the time of the murders.

[27] Williams's description of the challenged records is vague. Apparently, the State shared its discovery of cell phone records in stages and some materials were provided to the defense shortly before trial. However, contrary to Williams's assertion that the State was merely admonished for a lack of diligence, our reading of the record indicates that some records were excluded. Specifically, the trial court ruled that the "Tuesday documents" were excluded and advised the State that, due to late discovery, it had "lost the benefit of Troy Ward's phone records" as corroborative evidence. (Tr. Vol. II, pg. 200.) With respect to other phone records, Williams asserts that the State was neglectful because four months passed before he received any documents. But he does not explain how this pace prevented a fair trial. Indeed, the testimony and most of the exhibits demonstrating contacts between the quintet were admitted without objection. We discern no abuse of the trial court's discretion here.

---

[4] Jones was not in possession of a cell phone. His phone had been confiscated by his parents as a disciplinary measure.

[28] Additionally, Williams argues that the trial court should have allowed evidence that Jones and Gilbert had previously robbed a drug dealer. According to Williams, this would have aided his defense that he was not present at the crime scene by showing that Jones and Gilbert were a team that did not need assistance.

[29] In a hearing outside the presence of the jury, defense counsel for Williams and Ward recounted a revelation from Gilbert's pre-trial deposition. When deposed, Gilbert had purportedly admitted that he and Jones "once before" committed a robbery when they "just pulled [off] from somebody" who had intended to sell them marijuana. (Tr. Vol. III, pg. 118.) Defense counsel could not provide a specific time or name the victim; accordingly, the trial court ruled that the evidence of a prior robbery was so vague as to lack probative value.

[30] Defense counsel suggested that the evidence was admissible to show Jones's character and reputation, "because he is known for robbing people." *Id.* at 116. The trial court advised counsel that admission of such evidence would promote drawing a forbidden inference prohibited by Indiana Evidence Rule 404(b), which provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

Traditionally, Rule 404(b) has been used to protect a defendant from being convicted based on unrelated prior bad acts; that is, the jury should not be permitted to "infer that the defendant is a bad person who should be punished for other, uncharged misdeeds." *Garland v. State*, 788 N.E.2d 425, 428 (Ind. 2003). In *Garland*, our Indiana Supreme Court held that "the admissibility of evidence about prior bad acts by persons other than defendants is subject to Rule 404(b)." *Id.* at 430.

[31] Williams simply sought to show with sparse detail that, when Jones robbed Crowder, he was acting in conformity with his past misconduct and his bad character. The trial court did not abuse its discretion in excluding the proffered evidence.

## Target Store Surveillance Video

[32] Jones, Gilbert, and Stanley testified that Ward was in possession of a safe when he returned to Gilbert's vehicle and Gilbert then drove the group to a wooded area where they could attempt to open the safe. Gilbert and Jones soon left the others because of the need to obtain assistance for Jones's gunshot wound. This testimony was partially corroborated by a surveillance video from a nearby Target store. Target asset protection employee Kyle Hanephin ("Hanephin") testified as the keeper of the video.

[33] The State asked Hanephin a number of foundational questions, Williams' counsel objected to the tape's admission for lack of foundation, and the trial

court asked a series of questions of Hanephin before admitting the video. According to Williams,

> [H]ad the court not taken on the role of advocate, the court would not have had a basis to admit the video. The video stands as the single piece of evidence, outside of the questionable testimony of the co-defendants, that links [Williams] to the crimes. The State used the video to aid Stanley in identifying the three men walking from the woods as himself, [Ward], and [Williams].

Appellant's Brief at 34.

[34] Indiana law presumes that a trial court judge is unbiased and without prejudice. *Everling v. State*, 929 N.E.2d 1281, 1287 (Ind. 2010). To rebut this presumption, a defendant must establish from the judge's conduct that the judge's actual bias or prejudice has placed the defendant in jeopardy. *Id.* "A trial before an impartial judge is an essential element of due process." *Id.* However, "[b]ias and prejudice violate a defendant's due process right to a fair trial only where there is an undisputed claim or where the judge expressed an opinion of the controversy over which the judge was presiding." *Id.*

[35] The conduct and strategy of the parties is left to them and the ultimate decision is to be left to the jury. *Id.* at 1289. But a trial judge may in any case, within reasonable limits, interrogate a witness. *Kennedy v. State*, 280 N.E.2d 611, 620 (Ind. 1972). "The purpose of the judge's discretionary power to examine witnesses is to be an aid to the jury in its fact finding duties, however this must be done in an impartial manner so that the judge does not improperly influence

the jury with his own contentions." *Id.* In *Kennedy*, the judge employed a highly argumentative manner and repeatedly questioned an expert witness about his credentials and ability to testify accurately. *Id.* at 613. In so doing, the trial judge "lost his appearance of impartiality [and] removed his robes and donned the cap of the prosecutor," resulting in a reversal of the defendant's murder conviction upon appeal. *Id.* at 618. Williams claims that a similar scenario ensued here.

[36] The State offered the Target surveillance video as a silent witness to several young men, whom the State alleged to be Williams, Ward, and Stanley, leaving a wooded area near the Target store together. The "silent witness" theory, adopted by Indiana courts in 1979, permitted relevant photographs supported by a proper evidentiary foundation to be considered substantive evidence rather than merely demonstrative evidence. *Wise v. State*, 26 N.E.3d 137, 141 (Ind. Ct. App. 2015). The theory has since been extended to the use of video recordings. *Id.* As applied to video recordings:

> "[T]here must be a strong showing of authenticity and competency" and … when automatic cameras are involved, "there should be evidence as to how and when the camera was loaded, how frequently the camera was activated, when the photographs were taken, and the processing and changing of custody of the film after its removal from the camera."

*McHenry v. State*, 820 N.E.2d 124, 128 (Ind. 2005) (citing *Edwards v. State*, 762 N.E.2d 128, 136 (Ind. Ct. App. 2002)). The standard is applicable because a silent witness cannot be cross-examined. *Wise*, 26 N.E.3d at 141 (citing

*Edwards*, 762 N.E.2d at 136). A trial witness need not testify that the depicted image is an accurate representation of the scene when the image was taken; rather, the witness must provide testimony identifying the scene that appears in the images "sufficient to persuade the trial court … of their competency and authenticity to a *relative certainty*." *Knapp v. State*, 9 N.E.3d 1274, 1282 (Ind. 2014) (emphasis in original) (citations and quotations omitted).

[37] Here, Hanephin testified that he had created the video of events on July 16, 2017, the system was working properly, the system was checked daily, the system was locked within the asset protection services office, and he was familiar with the area under surveillance. He described State's Exhibit 267 as "a disk that I downloaded for [sic] the incident" and testified that it was an accurate copy and he had not altered it. (Tr. Vol. V, pg. 144.) Williams' counsel objected to admission of the exhibit:

> I would object that this is not a proper foundation. This witness testified he secures the outside, there's a foot path. I'm sure people walk that foot path often. So I'm not sure it's a proper foundation for playing a video. It's out of context in my opinion.

*Id.* at 146.

[38] The trial court sustained the objection, concluding: "him making the bare bones assertion that it was working is not sufficient for the silent witness foundation." *Id.* The prosecutor then questioned Hanephin as to how he knew the camera was working properly and he responded that there "is a health monitor function" at the top of the screen and "if that camera was down, I wouldn't

have been able to review video or save video." *Id.* at 147. At this point, the trial court began to question Hanephin, without additional objection from defense counsel. The judge asked Hanephin about the method for time tracking, whether the system was in-house or third party, how often the system was checked, and whether there was periodic maintenance. Hanephin responded that the system was third-party, and he checked it on each of his shifts but was not involved in the third-party maintenance. He described for the jurors a digital calendar and, at the State's instance, re-affirmed his assessment of accuracy.

[39] Williams's counsel interjected that there was "nothing to show that [on] that particular day that he had the ability to look at the accuracy of the time," *id.* at 150, prompting the court to ask additional questions. The court inquired about the frequency with which Hanephin checked the date and time, and asked whether, if Hanephin found the time or date to be inaccurate, there was a process for reporting the error to the third-party software programmer. Hanephin testified that such an error-reporting process existed but he had not experienced a problem of that nature during the relevant time frame. The trial court admitted the challenged exhibit into evidence, stating that defense counsel's objections concerned the weight, not the admissibility of, the exhibit.

[40] Our review of the record indicates that the State elicited testimony to establish that Hanephin was the creator and custodian of the video, he regularly checked for accuracy of the system, and he had no reason to doubt the time and date depicted. Hanephin described the setting, an outdoor area included in Target's

regular surveillance. He established the authenticity of the scene depicted and the accuracy of the video equipment. In sum, the State met the foundational requirements of *McHenry* apart from the trial court's intervention. And although the trial court took an active role in questioning a witness, the questions and answers provided clarification. The trial judge did not suggest answers, evince bias, or invade the province of the jury. Williams has identified no conduct akin to that of the *Kennedy* trial court. Here, the appearance of impartiality was never surrendered.

[41] Finally, with respect to evidentiary rulings, Williams claims that "cumulative error" warrants reversal in a case where the "evidence was hardly overwhelming." Appellant's Brief at 35. We disagree with Williams on both points; that is, he did not demonstrate an abuse of discretion or error in evidentiary rulings, and the evidence against him was strong – inclusive of testimony from three occurrence witnesses.

## Consecutive Sentences

[42] Williams claims that "concurrent sentences more properly reflect the circumstances of the crimes" explaining:

> [t]he imposition of consecutive sentences rests on shaky grounds because the judge sent a teenager to prison for life to pay for homicides he didn't commit in an apartment he reasonably thought would be empty, for a crime where no one was supposed to die.

Appellant's Brief at 40-41.

[43] The argument presupposes that Williams fired none of the shots that killed any of the three victims. There was evidence that both Ward and Williams entered the apartment armed with guns, and three men died, but Jones disavowed seeing Williams fire a kill shot. But even if the evidence does not definitively establish that Williams fired a fatal shot, there is abundant evidence that he acted in concert with Ward. Williams's subjective expectations aside, he was sentenced for the events that unfolded within the apartment. As to the sentence for that criminal conduct, we reiterate what our Indiana Supreme Court has observed: "when the perpetrator commits the same offense against [multiple] victims, enhanced and consecutive sentences seem necessary to vindicate the fact that there were separate harms and separate acts against more than one person." *Serino v. State*, 798 N.E.2d 852, 857 (Ind. 2003). And, "[a]lthough consecutive sentences are not always a given when there are multiple murder victims, concurrent sentences are undoubtedly the exception." *Lewis v. State*, 116 N.E.3d 1144, 1156 (Ind. Ct. App. 2018).

[44] Williams suggests that we should employ a "single incident analysis" when reviewing the consecutive sentences. Appellant's Brief at 41. He directs our attention to *Beno v. State*, 581 N.E.2d 922 (Ind. 1991). There, the Indiana Supreme Court found the imposition of three maximum, consecutive sentences for three drug dealing convictions based upon nearly identical State-sponsored drug sales to be manifestly unreasonable. *See id.* at 923. The conduct of a participant in a police sting, who was ultimately accorded some sentencing leniency, bears no relevancy to the brutal and senseless murders here. Williams

has identified no grounds for reversal of the order that his sentences be served consecutively.

## Appropriateness of Sentence

[45] Williams also asks that his murder sentences be reviewed for inappropriateness. He claims that he received "almost the maximum sentence even though he was not the shooter." Appellant's Brief at 43. Pursuant to Indiana Code Section 35-50-2-3, a person who commits murder is subject to a sentencing range of forty-five years to sixty-five years, with an advisory sentence of fifty-five years. Williams received a fifty-five-year sentence for Crowder's murder, and two forty-five-year sentences for the murders of Wright and Miller.

[46] Under Indiana Appellate Rule 7(B), this "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In performing our review, we assess "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The principal role of such review is to attempt to leaven the outliers. *Id.* at 1225. The "considerable deference" given to the trial court's sentencing judgment "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples

of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015) (citing *Cardwell*, 895 N.E.2d at 1222).

[47]   Williams received one advisory sentence and two minimum sentences. At bottom, his contention is that the aggregate sentence is inappropriate because the individual sentences are to be served consecutively. In *Cardwell*, the Court explained that it is the aggregate sentence under review:

> In the case of some crimes, the number of counts that can be charged and proved is virtually entirely at the discretion of the prosecutor. For that reason, appellate review should focus on the forest – the aggregate sentence – rather than the trees – consecutive or concurrent, number of counts, or length of the sentence on any individual count.

> The circumstances do, however, bear on whether consecutive sentences are appropriate. Whether the counts involve one or multiple victims is highly relevant to the decision to impose consecutive sentences if for no other reason than to preserve potential deterrence of subsequent offenses.

895 N.E.2d at 1225.

[48]   As for the nature of the offenses, Williams armed himself and invaded an apartment for the specific purpose of robbing Crowder. Three young men were fatally shot in their own home, without provocation or warning. The two young women inside the apartment hid in terror and emerged to find Crowder, Miller, and Wright dead of gunshot wounds to the head. The horrific crimes

netted the murderers a semi-automatic rifle, a few hundred dollars,[5] and an empty safe. Whether or not Williams fired a fatal shot, he was by all accounts a willing participant.

As for nineteen-year-old Williams's character, these were his first felony offenses. However, he had not remained a law-abiding citizen up until the current offenses. At age sixteen, he was adjudicated a delinquent child for having committed an act that would be burglary if committed by an adult. As an adult, Williams had a misdemeanor conviction for theft. At the time of sentencing, he also had pending charges for handgun and marijuana possession.

Having reviewed the matter, we conclude that the trial court did not impose an inappropriate sentence under Appellate Rule 7(B), and the aggregate sentence does not warrant appellate revision. Accordingly, we decline to disturb the sentence imposed by the trial court.

## Continuous Crime Doctrine

The continuous crime doctrine provides, in essence, some actions sufficient in themselves to constitute separate criminal offenses may nonetheless be so compressed in time, singleness of purpose, and continuity of action that they constitute a single transaction. *Gomez v. State*, 56 N.E.3d 697, 703 (Ind. Ct.

---

[5] Jones did not divide the cash with his cohorts.

App. 2016). Application of the doctrine invokes a fact-sensitive inquiry. *Id.* at 704.

[52] Williams contends that the events inside the apartment were so compressed that his independent conviction for Robbery cannot stand. According to Williams, "because [Jones] stole items while [Ward] killed the three men, the continuous crime doctrine applies." Appellant's Brief at 38.

> The continuous crime doctrine is a rule of statutory construction and common law limited to situations where a defendant has been charged multiple times with the same offense. "The continuous crime doctrine does not seek to reconcile the double jeopardy implications of two distinct chargeable crimes; rather, it defines those instances where a defendant's conduct amounts only to a single chargeable crime." *Boyd v. State*, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002)[.]

*Hines v. State*, 30 N.E.3d 1216, 1218 (Ind. 2015). The continuous crime doctrine may not be judicially extended to two distinct criminal offenses. *Id.* at 1220. "The continuous crime doctrine applies only where a defendant has been charged multiple times with the same 'continuous' offense." *Id.*

[53] Williams was convicted of three counts of Murder, for three separate deaths, and he does not challenge those convictions under the continuous crime doctrine. Murder and Robbery are distinct crimes, with distinct elements. Williams was not convicted of multiple counts of Robbery. The continuous crime doctrine does not apply to the facts of this case.

# Transcript

The final articulated issue concerns an order that Williams's appellate counsel partially reimburse the Indiana Public Defender's Office for a transcript prepared for Williams before he retained private appellate counsel. The State responds that it is not a party to a collateral order for payment. It is unclear as to whether there is an appealable final judgment against counsel. Nevertheless, the order is not integral to the merits of the criminal conviction on appeal.

To the extent that the controversy pertains to Williams, we observe that a party who was permitted to proceed in the trial court *in forma pauperis* may proceed in like manner on appeal without prior authorization from the trial court or the appellate court. Ind. Appellate Rule 40(A)(1). If a party is granted *in forma pauperis* status by this Court, the effect is that the party "is relieved of the obligation to prepay filing fees or *costs* in either the trial court or the Court on Appeal or to give security therefor[.]" App. R. 40(D)(1) (emphasis added). Costs are defined, in relevant part, in the Appellate Rules as "the cost of preparing the Record on Appeal, including the Transcript[.]" App. R. 67(B)(2). Thus, a defendant who has been determined to be indigent is entitled to a transcript on appeal at public expense. *See* I.C. § 33-40-8-5; *see also Hollowell v. State*, 19 N.E.3d 263, 266-67 (Ind. 2014) (noting that, after the Court of Appeals had granted him *in forma pauperis* status, Hollowell was entitled to a transcript of his post-conviction relief hearing at public expense); *Wright v. State*, 772 N.E.2d 449, 461 (Ind. Ct. App. 2002) ("[C]riminal defendants in Indiana who

cannot afford to pay for a transcript are still entitled to one if they are found to be indigent.").

[56] Because Williams had been granted *in forma pauperis* status at the time the transcript was prepared by the Public Defender's Office, he is entitled to the transcript at public expense.

# Conclusion

[57] Williams is not entitled to discharge under Indiana Criminal Rule 4. Sufficient evidence supports his convictions. The trial court did not abuse its discretion in evidentiary rulings nor did the trial judge become an advocate for the State. Williams has demonstrated no abuse of the trial court's sentencing discretion, and his aggregate sentence is not inappropriate. He is not entitled to vacation of his Robbery conviction under the continuous crime doctrine. As an indigent criminal litigant, he is entitled to a transcript at public expense.

[58] Affirmed.

Najam, J., and May, J., concur.