

FILED

Nov 27 2019, 10:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Andrew Bernlohr
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J. T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Troy Ward, *Appellant-Defendant,* | November 27, 2019 |
| | Court of Appeals Case No. 19A-CR-128 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Mark D. Stoner, Judge |
| | Trial Court Cause No. 49G06-1710-MR-41046 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Troy Ward (Ward), appeals his conviction for three Counts of murder, felonies, Ind. Code § 35-42-1-1(1); three Counts of felony murder, felonies, I.C. § 35-42-1-1(2); three Counts of robbery resulting in serious bodily injury, Level 2 felonies, I.C. § 35-42-5-4(a)(1); and one Count of carrying a handgun without a license, a Class A misdemeanor, I.C. § 35-47-2-1.

We affirm.

# ISSUES

Ward presents this court with two issues on appeal, which we restate as the following three issues:

(1) Whether the trial court abused its discretion in admitting into evidence a song posted by Ward on social media;

(2) Whether the trial court's questioning of a witness improperly aided the State and amounted to judicial bias prior to admitting a video surveillance tape; and

(3) Whether the State presented sufficient evidence to establish Ward's conviction beyond a reasonable doubt.

# FACTS AND PROCEDURAL HISTORY

In March of 2017, Sha-Lynn Poindexter (Poindexter) and Jordan Wright (Wright) moved into Somerset Apartments, in Marion County, Indiana. Although Poindexter and Wright were the only two parties on the lease, other

roommates moved in shortly thereafter, including Justin Crowder (Crowder) and Dominque Miller (Miller). Crowder's girlfriend, Zoe Radford (Radford), was a regular visitor at the apartment. Poindexter worked as a server in a local restaurant, Wright was a graphic design student, Miller worked for a landscaping company, and Crowder helped pay his share of the bills by selling marijuana.

[5] Sean Jones (Jones), who lived in the same apartment complex, was Crowder's regular customer and had bought marijuana from him at least five times in the past. During these sales, Crowder liked to do some "flossing," meaning showing off, "show people where things are," and openly revealed facts about his drug dealing profits and operation. (Transcript Vol. III, p. 243). As a result, Jones knew about Crowder's money, his guns, his marijuana, and the location of his safe.

[6] In the early evening hours of July 16, 2017, Poindexter, Wright, Crowder, Miller, and Radford were in the apartment. Poindexter and Wright were in Wright's bedroom, Radford and Miller were in the dining area which served as Miller's bedroom, and Crowder was cooking dinner in the kitchen. That same day, Jones was communicating via Snapchat with his friend Devante Gilbert (Gilbert), whom he had met at the Hope Academy. They often hung out and smoked marijuana together. During the conversation, Jones advised Gilbert to buy marijuana from Crowder and they agreed to meet at the basketball courts of the Somerset Apartment complex. Gilbert arrived at the basketball courts, driving his 2011 silver four-door Honda Accord. Once in the car, Jones used

Gilbert's phone to contact Crowder via Snapchat to purchase marijuana. Crowder did not answer. Jones then contacted Stanley Williams (Williams), who reminded Jones that they had previously discussed robbing Crowder. Williams had also purchased marijuana from Crowder in the past and also knew where Crowder kept his safe and money. Williams agreed to commit the robbery and Jones asked him, "you got any people, you feel me, like that we can do it with?" (Tr. Vol. III, p. 168). They needed other people because none of the three possessed a gun.

[7] After Gilbert and Jones picked up Williams at Park Hoover Apartments, Williams texted his people, Martell Williams (Martell) and Ward, to inform them of the robbery. Martell had a black Glock, .40 caliber handgun, and Ward brought a Smith & Wesson MMP 40. After picking both of them up, Gilbert drove everyone back to Somerset Apartments, where he parked his silver Honda opposite Crowder's apartment building.

[8] The plan was for Jones to knock on the door because Crowder knew him as a buyer. Ward and Martell would crouch down near Jones while he knocked, and then the three of them would enter. Williams would follow later, to help collect items during the robbery, while Gilbert remained in the vehicle and functioned as the get-away driver. Jones' job was to grab the safe.

[9] After Jones gained entry into the building and Ward and Martell covered their faces with scarves, Jones knocked on Crowder's apartment door. When Crowder opened the door, Ward and Martell pushed the door in, and Ward

pointed his gun at him. Crowder yelled, "what the f***" and fought with Ward. (Tr. Vol. II, p. 157). Ward shot Crowder in the head and Crowder shouted, "m***f***, you just shot me." (Tr. Vol. II, p. 157). Poindexter was still in Wright's bedroom and heard Crowder's yells and loud bangs coming from the living room. Wright advised Poindexter to hide, while he left the bedroom to investigate the noise, armed with one of his Japanese Samurai swords. In the living room, Radford also heard Crowder's shouts and the gunshots. She saw Miller reach behind the couch for Crowder's AR 15 rifle and hid under a blanket.

[10] Upon entering the apartment, Jones immediately went for the safe, which was located underneath a desk in the living room. As Jones jumped over the bed to reach the safe, Radford, who was hiding under the blankets, recognized him as "Sean." (Tr. Vol. IV, p. 84). Meanwhile, Ward, who had also entered the living room, noticed Miller reaching behind the couch for the AR 15 rifle. As both men fought over the gun, Ward shot Miller and Jones got injured in the back. Jones grabbed the safe and handed it to Ward, after which Jones took the AR 15 rifle and a couple hundred dollars he found on a nearby table.

[11] Ward, Martell, and Jones ran outside. When they reached the Honda, they placed the guns and safe in the trunk. Ward got into the Honda last, and while Gilbert pulled out of the parking spot, Jones stated "[Ward] just shot like three people in there." (Tr. Vol. V, p. 182). Ward searched for his phone in the car, but could not find it and told the others that he left his phone behind in the apartment. Jones realized that he was bleeding and yelled that he had been

shot. As they drove away, Ward was "pumped up" and stated, "I'm a murderer, I'm a murderer. Everybody in that bitch is dead. I shot a bitch." (Tr. Vol. V, p. 15). Gilbert drove them all to a wooded area near Lake Nora Apartments, suggested by Martell.

[12] When the gunfight occurred in the apartment, a downstairs neighbor, called 911. Garnett Bruce (Bruce), who lived in a nearby apartment, looked through the window and saw two of the perpetrators run towards the silver Honda parked across the parking lot, with one of them carrying a gun.

[13] Upon arriving at the wooded area, all five of them exited the car and removed the safe from the trunk. They attempted to open the safe by slamming it into the ground and shooting it. When they finally managed to open it, the safe was empty. Jones, in pain and bleeding, wrapped his shirt around his back to stop the blood loss. Gilbert drove Jones to his mother's house at 40th Street and Boulevard. The other three men walked from the wooded area to the Nora Target store near North Central High School. There, an acquaintance took Williams and Martell to Martell's house, and Ward walked in the other direction to his job at Taco Bell.

[14] Jones opted not to go to the hospital because he was afraid of being caught; instead, he hoped Gilbert's mother might help him. Jones gave some of the money from the robbery to Gilbert's mother to get gauze and bandages. Meanwhile, Williams kept calling Gilbert, telling him that he "need[ed] [his] stuff out [of] that car." (Tr. Vol. IV, p. 140). Gilbert gave the phone to his

father, who disposed of it. He also sold his Honda. When the police subsequently recovered the car, they found traces of Jones' blood inside. Jones eventually decided to go to the hospital and after his mother picked him up and he paid her some of the stolen money, Jones' mother took him to Methodist. At the hospital, Jones informed the staff that he was shot in a crossfire on Boulevard while trying to purchase some marijuana. When Detective Mark Howard (Detective Howard) arrived at the hospital, Jones, who was "jovial," repeated the story. (Tr. Vol. III, p. 75).

[15] At the Somerset Apartments, Garnett and her boyfriend, Andrew Tyll (Tyll), entered Wright's apartment. They found Miller dead, and Wright was lying face down in the hallway near his bedroom. Both Poindexter and Radford were still alive and Radford informed Tyll that she knew one of the robbers. Indianapolis Metropolitan Police Officer Theodore Cragen (Officer Cragen) was the first officer to arrive on the scene. He found all three victims, Miller, Wright, and Crowder, on the floor with gunshot wounds to the chest and head.

[16] Meanwhile, Detective Howard ran the license plate number on Jones' mother's vehicle and learned that Jones lived two buildings away from the triple homicide. Radford, being presented with a photo array which included Jones' photo, identified Jones as the one she knew as "Sean." (Tr. Vol. III, p. 93). As the investigation proceeded, Detective Harry Dunn (Detective Dunn) managed to identify the other individuals involved in the triple murder. After the identities were known, Detective Dustin Keedy (Detective Keedy) reviewed Ward's Facebook account, which in turn contained a link from Sound Cloud

which had been uploaded to Ward's Facebook account on September 28, 2017. Following this post, Detective Keedy located a song, sung by Ward, titled "I'm Different." (Tr. Vol. VI, p. 151). The narrative describes the story of a murder in which the murderer approaches the door of the victims, enters, and shoots the victims in the head and body. Forensic investigations revealed that five cartridge cases and seven bullets recovered from the crime scene matched the weapon used by Ward; while two cartridge cases and three bullets matched the weapon used by Martell.

[17] On October 23, 2017, the State filed an Information, charging Ward with three Counts of murder, three Counts of felony murder, three Counts of robbery resulting in serious bodily injury, and one Count of carrying a handgun without a license. On October 9, 2018 through October 15, 2018, the trial court conducted a jury trial. At the close of the evidence, the jury found Ward guilty on all Counts. The trial court merged all Counts, except for the three murder convictions, and one robbery conviction. On December 19, 2018, the trial court sentenced Ward to sixty years on each murder conviction, to be served consecutively and to five years on the robbery conviction, to be served concurrently to the other sentences.

[18] Ward now appeals. Additional facts will be provided if necessary.

# DISCUSSION AND DECISION

## I. *Admission of Evidence*

[19] Ward contends that the trial court abused its discretion by admitting the "I'm Different" song into evidence as its probative value was substantially outweighed by the risk of unfair prejudice.[1] The admission or exclusion of evidence falls within the sound discretion of the trial court, and its determination regarding the admissibility of evidence is reviewed on appeal only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012), *trans. denied*.

[20] "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evid. R. 403. The balancing of the probative value against the danger of unfair prejudice must be determined with reference to the issue to be proved by the evidence. *Bryant v. State*, 984 N.E.2d 240, 249 (Ind. Ct. App. 2013), *trans. denied*. Evaluation of whether the probative value of an evidentiary matter is substantially outweighed by the danger of unfair prejudice is a task best performed by the trial court. *Baer v. State*, 866 N.E.2d 752, 763 (Ind. 2007), *reh'g denied, cert. denied*, 552 U.S. 1313 (2008). While all relevant evidence is prejudicial in some sense, the question is

---

[1] During the trial court proceedings, Ward also objected to the introduction of the song based on impermissible prior bad acts evidence pursuant to Ind. Evid. R. 404(b). Because Ward did not appeal the trial court's ruling on that basis, we will only evaluate the merits of his argument in light of Ind. Evid. R. 403.

not whether the evidence is prejudicial, but whether the evidence is unfairly prejudicial. *Wages v. State*, 863 N.E.2d 408, 412 (Ind. Ct. App. 2007), *trans. denied*.

[21] Focusing on the "authorship or adoption" of the song, Ward claims that the State failed to present any evidence establishing that the song and lyrics were created by Ward after he committed the charged offenses. (Appellant's Br. p. 15). At trial, Detective Keedy testified about the procedure of reviewing Ward's Facebook account, which in turn contained a link from Sound Cloud, uploaded to the Facebook account on September 28, 2017, approximately two months after the murders took place. Following this link, Detective Keedy located a song, titled "I'm Different." (Tr. Vol. VI, p. 151). The detective identified Ward's voice from his review of jail phone calls. The evidence reflects that the lyrics to the song describe the narrator approaching the door of his victim: "I creep to the door." (State's Exh. 69). The victim then opens the door, after which the song's author describes two shots to the body and two shots to the dome, or head. Accordingly, the song is probative or relevant as it constitutes a detailed description of the charged offenses.

[22] In evaluating whether this evidence is unfairly prejudicial and should have been excluded, "courts will look for the dangers that the jury will (1) substantially overestimate the value of the evidence or (2) that the evidence will arouse or inflame the passions or sympathies of the jury." *Duvall v. State*, 978 N.E.2d 417, 428 (Ind. Ct. App. 2012), *trans. denied*. In support of his argument for exclusion, Ward cautions us that "[a] reviewing court must be particularly

vigilant in ensuring a prosecutor is not playing into the racial biases of a jury; biases that associate young black men with guns, violence, and the lack of appreciation for human life." (Appellant's Br. p. 16). Quoting a song by Johnny Cash, the State in turns responds that "a jazz loving juror could hardly be expected to cast a vote for guilt if the accused wrote a country western song instead, and rap is not the only genre to address realistic, violent, gritty or dark subject matter." (Appellee's Br. p. 28).

[23] However, when the evidence was admitted, the trial court instructed the jury that:

> This item is being introduced for a limited purpose. It is not being admitted and you may not consider it in any way to determine that [Ward] is a bad person or [Ward], in terms of the lyrical content, there are going, there are going to be slang terms, and other things that you may find that you may disagree with or unacceptable.

(Appellant's App. Vol. VI, p. 152). Accordingly, the trial court instructed the jurors that regardless of their response to the lyrical content of the song, they could not convict Ward based on his "artistic license," or as a sign that Ward lauded the murders. (Appellee's Br. p. 29). Jurors are presumed to follow a trial court's instructions. *Tormoehlen v. State*, 848 N.E.2d 326, 332 (Ind. Ct. App. 2006), *trans. denied*.

[24] The song, "I'm different," was highly probative of Ward's participation in the crimes given the accurate description of the murder scene. The song was recorded in reasonable temporal proximity of the shootings and Ward was

identified as its author who uploaded the song, as well as the singer by Detective Keedy. The evidence was not unfairly prejudicial because it was accompanied by a jury instruction that mitigated any risk that the jurors would consider the song based on racial prejudices. Therefore, we conclude that the trial court did not abuse its discretion in admitting the evidence.

## II. *Judicial Bias*

[25] In a convoluted argument in response to the State's foundational question, Ward asserts that during its introduction of a video surveillance tape, the trial court "took over the direct examination" of the witness, interjecting an impermissible judicial bias in the tribunal proceedings. (Appellant's Br. p. 19). In essence, Ward claims that the trial court assumed the role of advocate in laying the foundation for the surveillance tape, thereby imparting on the jury a showing of partiality.

[26] A trial court judge may, within reasonable limits, interrogate a witness. *Kennedy v. State*, 280 N.E.2d 611, 620 (Ind. 1972). The purpose of the trial court's discretionary power to examine witnesses is to be an aid to the jury in its fact-finding duties; however, this must be done in an impartial manner so that the judge does not improperly influence the jury with its own contentions. *Id*. Nevertheless, "interrogation of the witnesses alone does not make a judge biased." *Rosendaul v. State*, 864 N.E.2d 1110, 1115 (Ind. Ct. App. 2007), *trans. denied*. Hence, we must look at the trial court's questions to determine whether

the interrogation aided in the fact-finding process or revealed a bias of the judge. *Id*.

[27]    In the case at bar, the State attempted to introduce into evidence the video surveillance footage from Target, placing Ward near the wooded area where he and the other perpetrators gained access to the safe stolen from Crowder. When a predicate foundational objection to the videotape's admission was sustained, the trial court admonished the State that

> you have the systems working, you have it's checked, it's kept in a secured place, it's checked daily, but you're missing some other things in terms of the foundation necessary for the silent witness . . . There are foundations as to how it's working that I don't believe are in the record yet. Him making the bare bones assertion that it was working is not sufficient for the silent witness foundation. There are some more predicate questions to ask, I believe.

(Tr. Vol. V, p. 146). After the State resumed its questioning about the witness' knowledge about the camera's reliability, the trial court interjected and entered into the following colloquy with the witness:

> TRIAL COURT: How do you know that this video belongs to that day? How does your system track it in terms of date stamp, time stamp? How do you know that that's the video from that day as opposed to a video from another day?

> WITNESS: Well, I mean, I guess the best way I can explain it is if I walked out of the store right now and checked my watch, it would tell me whatever time, 5:56 we'll say. If I went back into the store and reviewed the video, it would show up at 5:56 that I walked out of the store based on the time and date listed in the video.

TRIAL COURT: But is this system that Target generates itself or do you buy it from someone else?

WITNESS: It's [a] third party.

TRIAL COURT: Okay. And so again, you say you check it daily. How often is the system checked so that you know that the system is working correctly?

WITNESS: Well, on each of my shifts, I check it. So, is that what you're looking for?

TRIAL COURT: No. Just how do you know that – you periodically have to have it maintained and checked by the third party, do you not?

WITNESS: I have never been involved in that. I mean, when I go into work daily, my camera system almost always is in good working order. If it's not, I would be the one to see that and I would call our client support center and it would help me fix those cameras. So, I don't see the updates or anything like that with it.

TRIAL COURT: Okay. So again, tell me how it is, when you get a request for a specific date at a specific time, you're going back sometime later. You didn't get that request that night.

WITNESS: Right.

TRIAL COURT: Okay. So you're going back to look at how, how do you tell that it's on July 16th as opposed to July 15th, July 17th.

WITNESS: I see.

TRIAL COURT: You have to have some internal system so that we know that that's exactly what we're looking at. Can you explain that to the jurors please?

WITNESS: Sure. So there is like a digital calendar, I guess you could say, within our system, and I can click on it and click on

any specific day. So if you ask me to do July 17th or 16th of 2017, within the time frame that we still have available for video retention, I could click on that day and go to a specific time, and it would pull that video up automatically.

(Tr. Vol. V, pp. 147-49). After the State was given the opportunity to ask questions on the trial court's questions, the trial court inquired, "[s]o State, are you reoffering [the video surveillance tape]." (Tr. Vol. V, p. 149). An objection was lodged and after the defense formulated a foundational objection, the trial court resumed its questioning of the witness as follows:

TRIAL COURT: So, let me ask you this. Maybe I don't understand what you're saying. So, let me ask it again. Then, when you go in and check your tapes, and you say you do this multiple times a day, are you, are you constantly checking the clock to make sure the time is accurate and the date is accurate?

WITNESS: I do very frequently. We get a lot of requests from our guests to look up transactions, for example, and they can give me the time of like 2:59 and they can tell me what register they were at, and I can pull it up to that date and time and see them checking out and it would match up with their receipt.

TRIAL COURT: Okay. But again, my question is, are you – [Ward] is asking you about the maintenance. That's what we are trying to make sure that we understand. Do you check on a daily basis to make sure that the clock and the date, time, matches what it is in real time as you're observing it?

WITNESS: That is not one of my routines. I don't daily check the time. I guess you could say I rely on it. But daily throughout my, you know, throughout my daily routine, through dealing with guests, or you know if I apprehend a shoplifter, I can see that the time matches up.

TRIAL COURT: Okay. So how often would you check in a given day or even a given week whether or not the time, the clock was working correctly and the date was correct?

WITNESS:  Each shift I would see that for sure.  Depending on how much I was on the sales floor versus in the office, it could be multiple times a day.

TRIAL COURT:  And if you had observed that the time and the date was wrong, would you have a process for reporting that to your third party?

WITNESS:  Yes.

TRIAL COURT:  And would that be something that you would do immediately if you saw the error?

WITNESS:  Yes.

TRIAL COURT:  Okay, and did you have any problems of that nature in this time frame for this request?

WITNESS:  I did not.

(Tr. Vol. V, pp. 150-52).  Without allowing either party further questions, the trial court "overrule[d] the objection" and admitted the videotape.  (Tr. Vol. V, p. 152).

[28]  "A jury of laymen will often have an awesome respect for the institution of the American trial judge.  This will lead them to accord great and perhaps decisive significance to the judge's every word and intimation."  *See Kennedy,* 280 N.E.2d at 621.  It is apparent that the trial court aided in the fact-finding process of establishing the reliability and the foundation to admit the surveillance tape. This questioning did not reveal any bias against Ward as the interrogation was not calculated to impeach or discredit the witness.  *See id.* at 620 (a trial court judge exceeds his fact-finding role when the judge asks questions calculated to impeach or discredit a witness.)  While we agree that the trial court by its

lengthy questioning unduly emphasized the importance of the videotape, this was harmless error, as Ward was placed at the wooded area by other testimony. In fact, Ward and the others were seen and heard by a witness in the wooded area, near the Target store and Lake Nora Apartments. In her testimony, the witness accurately described by skin color, clothing, and age range all suspects involved. The witness also stated that Ward had a black bag and rifle in his possession. Accordingly, we conclude that the trial court was not biased in its questioning of the witness prior to admitting the video surveillance tape.

### III. *Sufficiency of the Evidence*

[29] Lastly, Ward contends that the State failed to present sufficient evidence beyond a reasonable doubt to sustain his conviction. Our standard of review with regard to sufficiency claims is well-settled. In reviewing a sufficiency of the evidence claim, this court does not reweigh the evidence or judge the credibility of the witnesses. *Clemons v. State*, 987 N.E.2d 92, 95 (Ind. Ct. App. 2013). We consider only the evidence most favorable to the judgment and the reasonable inferences drawn therefrom and will affirm if the evidence and those inferences constitute substantial evidence of probative value to support the judgment. *Id*. Circumstantial evidence alone is sufficient to support a conviction. *Sallee v. State*, 51 N.E.3d 130, 133 (Ind. 2016). Circumstantial evidence need not overcome every reasonable hypothesis of innocence. *Clemons*, 987 N.E.2d at 95. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Id*.

[30] Assuring this court that his claim is not a request to reweigh credibility, Ward contends that "Jones had significant bias and motivation to provide the State of Indiana with the testimony against Ward they wanted." (Appellant's Br. p. 18). Ward claims that there was little to no direct evidence that Ward was at the scene of the crime or otherwise involved in this criminal enterprise, "outside of the questionable testimony of Jones." (Appellant's Br. p. 19).

[31] Even disregarding Jones' testimony, the State presented an abundance of evidence implicating Ward and placing him at the scene of the crime. Gilbert and Williams both identified Ward as one of the armed perpetrators that entered the apartment. Gilbert testified that Ward admitted to the murders by exclaiming, "I'm a murderer, I'm a murderer. Everybody in that bitch is dead. I shot a bitch." (Tr. Vol. V, p. 15). Ward himself translated the events of that day into detailed lyrics and posted them on the internet for a wider audience to enjoy. Ballistic analysis linked the bullets and casings strewn about the apartment and found in the victims' bodies with the make, caliber, and model of gun used by Ward. The surveillance videotape from Target linked Ward to the site where the suspects attempted to open the stolen safe and showed him walking with Williams and Martell towards North Central High School. In light of the testimony and evidence admitted at trial, we conclude that the State presented sufficient evidence beyond a reasonable doubt to sustain Ward's conviction.

# CONCLUSION

Based on the foregoing, we hold that the trial court did not abuse its discretion by admitting into evidence Ward's song posted on social media; the trial court's questioning of a witness did not amount to judicial bias; and the State presented sufficient evidence to establish Ward's conviction beyond a reasonable doubt.

Affirmed.

Vaidik, C. J. and Bradford, J. concur